# Hewitt, Ruffner & Co. *vs* Sturdevant, Wilson *et al.* and Wilson *vs* Hewitt, Ruffner & Co.

ERROR TO THE LOUISVILLE CHANCERY COURT.

*Partners and partnership property. Chattels.*

CHIEF JUSTICE EWING delivered the opinion of the Court.

In 1838, Hewitt, Ruffner & Co. and L. G. Sturdevant and John Wilson, agreed to build, and did build and fit out the steamboat Hugh L. White, near the City of Louisville, to be employed on the western waters, in carrying freight and passengers for profit; Hewitt, Ruffner & Co.

CHANCERY.

4bm453
110 91

*Case* 90.

*April* 29.
Case stated.

to be interested one half, Sturdevant one third, and Wilson one sixth. The boat was completed and fitted out, and commenced business about the 1st of January, 1839, under the command and management of Wilson as Captain and master and Sturdevant as clerk. Prior to entering on business, a settlement was made among the part owners, of the building account, and a set of books opened for the use of the boat, in which balances were struck for each party with the joint concern, charging each, first, with his ratable share of the aggregate cost, as his stock, and then debiting and crediting each, according to the result of the settlement, with the sum which either fell short or exceeded his share in advancements—by which, Wilson was made and set down as debtor to the boat $4184 58 cents, and Sturdevant $1270 85 cents, and Hewitt, Ruffner & Co. as creditor, $7177 39 cents. With this settlement and these charges and credits upon the boat books, the concern commenced business as freighters and carryers of passengers, and continued to do business, with Wilson as master and Sturdevant as clerk, until about the commencement of the year 1840, when, from the confusion into which Sturdevant, the clerk, from negligence, fraud, or incompetency, had gotten the books, it was deemed proper to dispense with his services as clerk, and to engage another to attend to those duties. Charles Tenis was employed in that capacity, and the boat continued to do business until about the 18th of March, 1840, when Hewitt, Ruffner & Co. having discovered that the boat was and had been doing a losing business from the time she was started, and that she was involving the concern daily, more and more in debt, determined to sell her, and did, on the day last aforesaid, at Smithland, with the consent of Wilson, who was in command, and had the boat at that place loading for Nashville, sell the whole boat to Quarrier, Bell, and Bradford, for $18,000, on time, to be delivered when the boat arrived at the port of destination. Hewitt, on behalf of Hewitt, Ruffner & Co. and on behalf of Sturdevant, executed a bill of sale to the purchasers, and took from them bills of exchange and notes for the whole price; Wilson was to execute the bill of sale

when the boat arrived at Nashville, but neglected or failed to do so. But the boat was delivered, by him, to the purchasers, about the 20th or 25th of March, 1840, according to the contract.

On the 15th of April, 1840, Hewitt, Ruffner & Co. filed their bill charging the foregoing facts, and alledging that Wilson and Sturdevant were giving out in speeches, that they had not parted with their interest, and were setting up claim to the same, to the annoyance of the complainants and the purchasers. They charge a partnership in the building and business of the boat, a large balance in their favor, and pray a settlement of the whole concern, and that the purchasers may be quieted in their purchase, and general equitable relief afforded. They further prayed an attachment against the boat, which was granted, and levied on Wilson and Sturdevant's interest in the same, the boat then lying at the wharf at Louisville.

Woods, Stacker & Co. claiming title to Sturdevant's interest, intervened, and upon their petition were made defendants, and answering, set up their purchase from Sturdevant for a balance, which they alledge he owed them for iron purchased, amounting to $7406 62 cents, and exhibited Sturdevant's bill of sale for one third of the boat, bearing date the 19th April, 1840, at Nashville. They make their answer a cross bill against the complainants and their vendees, and Wilson and Sturdevant, and pray that they may have and be quieted in their purchase, and for a general settlement of the accruing profits of the boat after their purchase. They admit their knowledge of the previous sale of the boat to Quarrier, Bell, and Bradford, and their possession, but controvert the indebtedness of Sturdevant to the complainants, or their knowledge thereof, except about $900, paid by them for him on the insurance of his part of the boat. They contend that Sturdevant held as a tenant in common, and resist the complainant's lien upon the boat, &c.

Quarrier, Bell, and Bradford answered the bill and cross bill, insisting on their purchase of the whole boat for a full consideration, and for an abatement in the price if their title to the entire boat should not be sustained.

The object of the complainants' bill.

Woods, Straeckr & Co. come into the case by answer made a cross bill.

The answer of Quarrier, Bell, & Bradford, and Wilson and Sturdevant.

Wilson and Sturdevant also answered the bill and cross bill, and the former insisted that he had assented to the sale and delivered the boat at Nashville, upon the terms and conditions that he was not to sustain any loss, and upon these terms he is willing that the sale may stand. He admits the agreement to build, or rather to buy the boat, and contends that he was not to pay any part of the consideration in the first instance, but it was expressly agreed by the *joint concern*, that he was to act as the Captain and master, and his share or proportion was to be paid out of the profits of the boat. He also contends that by the *original agreement*, Sturdevant was to act as engineer, but he was afterwards transferred to the station of clerk, the duties of which he was wholly incompetent to discharge. Sturdevant answered, stating that the complainants, Wilson and himself, did build and run the boat Hugh L. White, *together* and as *joint owners*, and not as partners, each part owner being entitled to the interest charged in the bill. He says that the complainants, as an original claimant of the *joint contract* for building said boat, persuaded him and Wilson to take an old boat, (Signal,) at $4800, belonging to them, to be fitted/up and used in carrying produce to New Orleans, towed by the other boat, and promised to furnish freight for the new boat, in salt, when not otherwise employed, "that would be much more profitable to *its joint owners*" than could be procured from promiscuous patronage, and that in this way, any slight loss on said old boat would be more than compensated;" that relying upon those representations, said old boat was fitted up at great cost, and received as a *part of the property of said company*, at the price aforesaid, when the same was not worth more than $1500. He further states that said boat, Hugh L. White, was, as charged in the bill, put under the command of Wilson as master, and he had no charge or control of her, "except as owner to the extent of a *joint*, undivided third;" "that the old boat was sold for about the sum of $1526 39 cents, and if he was credited with his third of the loss, he would not be indebted to the *said company* at all;" "that the $1526 39 cents was put to the credit of *the company* and the complain-

ants received all the avails of her sale." He says, "that he sold his one-third of the boat to Woods, Stacker & Co. in good faith, for the sum of $7400; that he is willing to have the *joint business and connection of said* complainants and respondents, in relation to the boat, settled by your honor in this case."

Upon the hearing, the Chancellor determined, in accordance with the principle settled by Lord Hardwick in the case of *Wedlington* vs *Hallett*, (1 *Ves. Jr.* 497–99,) that as between the original parties or their representatives, that the complainants had a lien on the boat for the excess of their advancements over their share on the account settled for building and fitting out the boat, but that Woods, Stacker & Co. had purchased Sturdevant's one-third, without notice of the lien, and held the same as innocent purchasers, for a valuable and adequate consideration, and the lien was not enforcible against that interest in their hands, but that they be quieted in its uninterrupted enjoyment. He further decreed that Quarrier, Bell, and Bradford be quieted in the enjoyment of four-sixths of the boat; and having, upon the Master's report, settled the accounts between the original part owners, he decreed Sturdevant to pay to the complainants $5055 95, and after crediting Wilson with his share of the proceeds of the sale to Quarrier, Bell, and Bradford, decreed him to pay to the complainants, $1613 04, and divided the costs in a manner not necessary to be noticed.

The complainants have appealed to this Court, and Wilson has filed cross errors.

It is unquestionably true, that in the general, part owners of a ship or boat, hold as tenants in common, and the part of either is not liable to a balance of accounts as between joint tenants and partners. But Lord Hardwick determined, in the case above referred to, that a joint owner of a ship was entitled to a lien as against the administrator or general creditor, upon the share of his intestate, a co-builder and fitter out of the vessel, for any excess of advances over his aliquot part. And in the case of *Smith* vs *DeSilva*, ( *Cowper*, 469,) Lord Mansfield, in effect, sustained the same principle. But the

principle of these cases has been regarded as strongly impugned if not overturned by the decisions in the case *ex parte Young*, (2 *Ves. and Beam*, 242;) (2 *Rose*, 78, *note;*) *ex parte Harrison*, (2 *Rose on Bankruptcy*, 78;) *ex parte Gibson*, (1 *Montague on Partnership*, 102, *note;*) *ex parte Parry*, (6 *Ves.* 575,) and other late decisions. And Chancellor Kent, in the case of *Nicoll* vs *Munford*, (4 *John. Chy. Rep.* 522,) regarding the principle laid down by Lord Hardwick as overruled by the later decisions referred to, decided the case in conformity to those decisions: but his decree was reversed by the Court of Errors, (20 *John. Rep.* 611,) after a full argument and examination of all the authorities on the subject. And in the case of *Lamb* vs *Durant*, (12 *Mass. Rep.* 54,) it was assumed as unquestionable, that vessels as well as other chattels, might be held in strict partnership, with all the rights and control in each partner incident to commercial partnerships.

The decision of Lord Hardwick, as applicable to the facts of the case before him, seems to us to be founded upon the clearest principles of equity. The facts of the case before him justified the determination only, and he can be regarded only as deciding, though his reasoning went farther, that the administrator of an intestate part owner of a ship had not a right to take his share and apply it to the claims of his general creditors, free from the costs and expenses incurred by a co-builder and fitter out of the vessel, over his share: but that he was entitled to a lien on the vessel for his excess of advances, settled upon the principles of a partnership, as to the building and fitting out.

And what reason, propriety, or justice would there be in allowing a general creditor to receive and bear away the proceeds of that part or interest in a ship which was in part or in whole built, erected, and rendered valuable by the extra advances of a co-builder, and which might never have existed or been made valuable but for those extra advances?

The decisions that have been cited, as conflicting with the decisions of Lord Hardwick and Lord Mansfield, are all post-revolutionary decisions, and have no authorita-

tive influence with this Court, and cannot be regarded, if it were conceded that they cannot be reconciled with the long acquiesced in decisions of those two distinguished jurists.

But from the facts in this case, we do not feel authorized to restrict the complainants lien on the boat to the balances in their favor on the building account only.

We think that the facts in the record before us justify the conclusion that the parties concerned were partners; that the boat was built and fitted out by them *as partners,* to be used and employed by them in the trade and business of freighting and carrying passengers, for profit, as *limited partners;* that they were partners in the boat and in the trade and business, each to be entitled to a share of the profit and subject to a share of the loss, ratably with the interest which he held in the boat; that the boat was built by them jointly, as the *instrument* of their trade and business, and the means of carrying it on, and was the *capital stock* or *foundation* of the same.

That a ship or steamboat may be the subject of partnership, as well as any other personal chattel, we think cannot be doubted. Why may it not be held as partnership property as well as a stage coach, a wagon or any other chattel used or employed in the business of commerce or trade?

Even real estate may become partnership property, as a store house, brew house, or ware house, when purchased with the partnership funds, or acquired, as we presume, by purchase or erection, as a part of the *capital stock,* and with a view to a *partnership trade* or business, and when so held, though held in joint tenancy, in law, and subject to the *jus accrescendi,* yet equity will treat it as a tenancy in common, and as forming a part of the partnership fund, and subject to distribution as such: 3 *Kent's Com.* 14.

That the parties, concerned in interest in the boat, *were partners* in the business of freighting and carrying passengers, and built and fitted out the boat with a view to, and as the instrument of that business, is deducible from the following facts in the record.

HEWITT, &c.
*vs*
STURDEVANT, &c

The parties held, as partners, the boat, H. L. White, in contest.

A ship or steamboat may be the subject of a partnership holding as well as any other chattel.

So may real estate, in equity, when purchased with partnership funds or made stock for partnership purposes.

The bill charges a partnership, and Sturdevant, though he denies a partnership, admits the building and running of the boat as *joint owners*, and speaks of the contract for building as a *joint contract*, and the boat, Signal, which was purchased as a tow-boat for the new boat, as the *property* of the *company*, and the business in which they were engaged as a *joint business*. All which expressions, and others to be found in the body of his answer, shows the existence of a joint company, and a joint tenancy or community of interest, in the *building* and *business'* in which they were engaged, which amounts to a partnership.

Wilson also, in his answer, speaks of the parties as a *joint concern*, and it is made manifest by the answer of both Wilson and Sturdevant, that the parties in the contract for building looked to the future business of the boat as the source of their profits, under the superintendence of two of the company, the one as commander, the other as engineer or clerk.

It also appears that the parties, previous to the commencement of business with the boat, settled up their building account, as a *partnership concern*, and placed the result on the boat books—the very. books which were to be used in the business upon which the boat was about to enter, as the source of their expected profit—by which Wilson and Sturdevant are set down as debtor to the boat, (by which we understand the boat company,) the sums which each, respectively, had fallen short in the building account, and the complainants credited with their excess of advances on the same account.

From these facts we infer that the parties were jointly interested in the building and fitting out the boat; were joint contractors, and were consequently looked to and chargeable *in solido*, by workmen and materialsmen; were as partners, though, by the agreement among themselves, each was to be responsible among themselves, only for his ratable amount according to the quantum of his interest in the boat. And it may have been, and was most likely stipulated among themselves that Wilson and Sturdevant, out of their services and the earnings of the boat,

were, respectively, to discharge the amount of their deficiency.

That the parties, and especially the complainants, understood that they held a lien on the boat and its earnings, for any balances that were or might be owing them, is manifest; otherwise it cannot be believed that they would have permitted Sturdevant and Wilson, who are most likely irresponsible, to depart with and remain in the possession and control of the boat so long, without taking from them an express lien upon their interest as the means of securing them. They never could have believed that, by the terms and nature of the contract between the parties, that Wilson had an unincumbered interest of one-sixth in the boat, which he had a right to sell, at discretion, vesting an absolute title in the purchaser, free from any claim or lien in their favor, for the large advances made on his share. Nor can it be believed that they would have trusted to Sturdevant's individual responsibility for the balance which he had failed to pay, had they not relied upon the contract of co-partnership as affording them ultimate security, on winding up the business of the concern. Yet such would have been their condition, if the terms of association be regarded as conferring on each a mere tenancy in common in the boat and its earnings.

That they relied on the contract and terms of connection, as affording them a lien on the boat, is inferable from the fact that Wilson assigned over to them his policy of insurance on his interest in the boat, as the means of their indemnity in case it was lost. The boat they looked to as their indemnity if not lost, and its value in damages upon the policy assigned to them, if lost. That same precaution which induced the taking of the assignment of the policy, as a security, would most likely have impelled them to take an express lien upon the boat, as their security, had they not believed that by the terms of association between the parties, they were already entitled to a lien upon the general settlement of accounts.

Without pursuing the facts further, we are satisfied that the parties were partners in the building and running

HEWITT, &c.
*vs*
STURDEVANT, &c

of the boat, and stand upon the footing of partners in the settlement of their accounts.

But though we regard the parties as partners, in the building and business of the boat, we do not regard either as possessing the power to sell the whole boat without the consent of his co-partners. The boat was built and fitted out not to *sell*, but to be used in the business of freighting and carrying passengers for profit, superintended and controlled by two of the firm, to that end. From the nature and object of the association, and character of the property, and uses and purposes to which it was to be applied, the power in either party to sell the whole boat cannot be implied. Either cannot be divested of his interest without his authority or consent. The sale, therefore, by the complainants, to Quarrier, Bell, and Bradford, did not pass the title of Sturdevant, or divest him of his interest in the boat. But though it did not pass his title, it purported to pass the title in the whole boat, and for a consideration for the whole, and full possession was delivered, and the purchasers took and held the entire possession and control, claiming the absolute title to the whole against the whole world, and so held and claimed at the time of the sale by Sturdevant, of his interest, to Woods, Stacker & Co. The question arises, therefore, whether Sturdevant's sale passed any title to his vendees?

We regard the boat as a personal chattel, subject to those rules of the common law applicable to other chattels, and it is well settled that no title passes by the sale or transfer of a personal chattel in the *adverse possession* of another: *Waggener* vs *Hardin*, (2 *B. Monroe*, 156,) and the authorities there referred to. Quarrier, Bell, and Bradford were in the adverse possession of the boat at the sale by Sturdevant, claiming and holding the entire possession, and have so held it ever since. They did not claim to hold as bailees of Sturdevant, or as co-tenants with him, but as adverse to him. He was ousted of his possession as co-tenant, and a mere title and right of possession remained, which amounted to no more than a mere *chose in action* or right to sue, which could not be transferred or assigned to another. To allow such transfer would be to allow the assignment of a law suit, and

A steamboat built and fitted out by partners, for the carrying on trade, is not subject to sale by one part owner thereof.

A part owner of a steamboat, built by partners, cannot sell the entire boat, but if he so sell, and the boat be in the adverse possession of a purchaser, a sale by the other part owner, out of possession, passes no title, it is the sale of a chose in action only.

to encourage litigation, which is repugnant to the well established principles of the common law. It may be well questioned, therefore, whether Woods, Stacker & Co. derived any title, legal or equitable, by their purchase, and if not, whether this suit should not, in all respects be settled as between the original contracting parties, in which case no dificulties could arise about the partnership or tenancy by which each held his part in the boat. For, as both Wilson and Sturdevant seem to be non-residents, and perhaps irresponsible, upon the settlement of the accounts, and their failure to pay the balances due from each, their interest in the boat, under our statutes, and perhaps upon equitable principles, independent of the statutes, might be subject to the payment of those balances, though they held as tenants in common.

Though the assignment of a chose in action, or a right to a personal chattel, in the adverse possession of another, passes no *legal* title, courts of equity have so far departed from the common law rule as to interpose in favor of the assignee of a chose in action; founded upon or springing out of a contract, as the assignee of a bond, judgment, or demand for a debt or damages, and afford such assignee relief, treating him as *cestui que trust*, and the assignor as holding the legal title, for the use of the assignee. And courts of law have so far departed from the common law rule as to permit the assignee to sue at law, in such cases, in the name of the assignor, for the assignee's *use*.

Courts of equity sometimes interfere in behalf of the assignee of a chose in action, treating the holder as trustee for his benefit. Ct's of law sometimes protect equitable holders of writings, in the use of the name of the original payee, to recover a demand—

But we recollect of no case where courts of equity have interposed and afforded relief to a vendee of a personal chattel, purchased, or attempted to be purchased, when the adverse possession was in a third party.

But not to protect a vendee of a personal chattel adversely held by another.

To allow such interposition and relief would be to abolish the common law rule in every obnoxious litigated controversy, and to transfer from a court of law to a court of chancery the trial of the right of property as well as the right of possession to a mere personal chattel. If no such power exists or can be exercised by the chancellor, then the claim of Woods, Stacker & Co. cannot be sustained or regarded by the Court, and if allowed to intervene at all, he should not be allowed to litigate the title

to the boat, but might perhaps be allowed to intervene to the end of litigating his rights with Sturdevant, growing out of their contract with him, and setting up their claim to any balance that he might be entitled to on the settlement of the general accounts between the original owners of the boat. But if Woods, Stacker & Co. should be regarded, in equity, as *cestui que use* of Sturdevant's interest, and Sturdevant as holding the legal title to their use, yet their title would amount to no more than a mere equity, unconnected with the legal title, junior in date to the equity of the complainants, as co-partners, and not entitling them to notice of the partnership, or tenure by which the orignal parties held the boat, and entitling them only, as standing in the shoes of Sturdevant, to the balance of the proceeds of the boat, after the liquidation and payment of all the outstanding debts and liabilities of the company.

A junior equity, combined with the legal title, without notice of a senior equity, will be protected against the senior equity, but the senior equity always prevails against the junior, with or without notice; the senior may as well complain of the want of notice of the junior as the junior can complain of a want of notice of the senior.

*A junior equity, united to the legal title, without notice of a senior equity, will be protected against the senior equity.*

Woods, Stacker & Co. cannot, therefore, occupy the condition of innocent purchasers, nor will the want of notice protect them as such, were it conceded, in accordance with the intimation of Lord Hardwick, in the case of *Wedlington* vs *Hallett, supra,* that notice to the vendee of the legal title, of the partnership or outstanding lien, was necessary to protect the lien.

But were it conceded that Woods, Stacker & Co. acquired the legal title, by their purchase from Sturdevant, there is no satisfactory evidence in the record that they paid for it an adequate valuable consideration, which was necessary to constitute them innocent *bona fide* purchasers.

Bradford proves that he *understood* that the purchase was made in satisfaction of the balance of an account for iron, owing by Sturdevant to Woods, Stacker & Co. but from whom, or how he understood it, is not stated, nor does he pretend to state that he knew, of his own knowl-

edge, any thing about the account, nor can it be presumed, from the manner of his statement, that he had any personal knowledge of its existence or correctness. If there be any other evidence, in the record, of the existence or correctness of the account or indebtedness, it has escaped our observation. If such account or indebtedness existed it was competent to be proved, and the omission to prove it (it being a fact susceptible of proof,) creates a presumption of its non-existence.

The bill of sale of Sturdevant was executed after and with the full knowledge of the previous sale made by the complainants, and is not, therefore, free from the suspicion of stratagem and contrivance to defeat the complainants just claims. And it purports to be made in consideration of 7,406 *dollars* 62 *cents, to him in hand paid.* He says, in his answer, that the sale was made for the sum of $7,400, and makes no mention of the iron account. Woods, Stacker & Co. alledge, in their answer, that the sale was made in satisfaction of a large balance owing them, on an iron account, and exhibit no account, nor make any proof of the existence of such an account.

We can scarcely believe, with this lack of proof and discrepancy between the bill of sale and answer, especially when the true condition of the property and circumstances under which the sale was made are taken into consideration, should be deemed sufficient to place them upon the high ground of innocent purchasers for a valuable and adequate consideration.

But if it be conceded that they acquired the legal title by their purchase, and gave for it an adequate consideration, we cannot admit, from the circumstances developed in this record, that they can claim protection as innocent *bona fide* purchasers, on the ground of a want of notice of the partnership, or of any equitable lien which the complainants could rightfully set up.

Apprised of the fact of the previous sale by the complainants, of the whole boat, and of the adverse actual possession and holding of the vendees, under a claim of the entire interest, and of the further fact of an existing controversy between the complainants and Sturdevant, in relation to the boat; they were apprised of those facts

which should have put them upon inquiry, which has been ever deemed tantamount to actual notice. They were furnished with a clue and warned by what they knew to make inquiry, and to make it, not of Sturdevant, an interested party seeking the opportunity to sell, but to make it of the vendees who were in possession, and if they could not afford it, to make it of their vendors, who having assumed to sell the entire interest, it must have been presumed had some authority to do so, or some claim or lien upon the boat, which they deemed sufficient to cover the interest of Sturdevant. And it cannot but be presumed that a reasonably prudent person, desiring to purchase, *bona fide*, and in the purchase to guard himself against litigation, risk, or loss, would have been impelled by the facts suggested, to make all the inquiry which we have suggested, before he would have closed a bargain with Sturdevant. And we are constrained to believe, from the failure of Woods, Stacker & Co. to push the inquiry thus far before their purchase, as well as from the enormously extravagant price they claim to have given, that it was a catching bargain, made either to aid Sturdevant in escaping from just liability to the complainants, or seized at all hazards, as the last plank in the shipwreck of Sturdevant's means, and as their only hope to save, in part or in whole, a desperate debt, if indebtedness existed. If so, they were *adventurers* and not innocent *bona fide* purchasers, deceived and deluded into the purchase innocently, for the lack of notice or a clue to obtain it.

Possession of real estate has ever been regarded as notice to a purchaser of all titles or claims, legal or equitable, which the possessor has or may set up, to shield his possession. The same rule, we think, is applicable to the possession of chattels.

*Possession is notice to all the world of the holders claim to real estate—so of chattels.*

Quarrier, Bell, and Bradford, by their purchase, are entitled to all the titles, liens, or rights, legal or equitable, that their vendors were or are entitled to as a shield to their purchase and possession, and notice of all such rights will be implied against the subsequent purchasers from Sturdevant, as they were furnished with the facts by their knowledge of the possession and ownership, and

*Part owners of a steamboat, built for the carrying trade, have a lien for advances made for the boat for other part owners, beyond their proportion, and which their vendees may assert.*

the source from which it was derived, by the exercise of ordinary care and diligence, to arrive at a knowledge of the whole of them. They cannot shut their eyes to the lights which they had, and which, if pursued with the vigilance, care, and precaution of a prudent man, would have led to a full discovery of their true nature, import, and character, and then say that they are innocent *bona fide,* deluded purchasers, entitled as such to the protection of a Court of Equity—*vigilentibus non dormientibus servit lex.*

Upon the whole, we think that they can stand in no better condition than Sturdevant, if, under the circumstances of their purchase, while the boat was adversely held by others, they be allowed to intervene at all. The controversy must be settled as if the original contracting parties were the holders of the boat, and the only parties interested, except so far as the sale to Quarrier, Bell, and Bradford has effected a change in their titles, interests, and relations. And as the boat was doing a losing business and involving the owners deeper and deeper in debt, and Sturdevant, at the time of the sale, was behind more than the whole value of his interest in the boat, estimated at its fair value, and his interest equitably subject to its payment; and as the complainants and Wilson, owners of two-thirds of the interest, concurred in or consented to the sale; and as the sale was effected at from three to six thousand dollars more than it was worth, and in all reasonable likelihood, more than the largest amount above what it would have commanded had it been sold under a chancery decree, for ready cash, to raise the balances due from Wilson and Sturdevant, we think the sale ought to be confirmed, and the proceeds applied to liquidating those balances and settling up the affairs of the concern. That has been done in the sale which a Chancellor would have done, had the case been before him, and more advantageously done for all parties, than if it had been done under his order or decree, and should not be disturbed at the instance of either Sturdevant or his vendees. And as the amount of Sturdevant's interest in the consideration will more than cover the balance due from him, including the sum for freight, applied in the

payment of his individual debt to Woods, Stacker & Co. it will be unnecessary to consider or dispose of the question raised on that subject.

In relation to the question raised on the cross errors of Wilson, we would remark, that it appears in proof that Hewitt, acting for Hewitt, Ruffner & Co. declared, just before the sale of the boat, that Wilson should lose nothing by the sale, and would consent to it, and with this declaration upon his lips he went to the opposite side of the Cumberland river, to where the boat was lying to see Wilson on the subject, and returned stating that Wilson was willing for the sale, and would surrender the boat to the purchasers at Nashville. Wilson contends that he was induced to consent to the sale upon the promise of Hewitt that he should lose nothing by it. The facts are sufficient, as we think, to justify the presumption that the promise was made to Wilson, and he was induced to consent to the sale and to give up the boat in consequence of it. It is difficult to understand what was meant by the promise. It was a losing business to continue running the boat, as had been demonstrated by previous experiments; and in this respect Wilson, as well as the other partners, would *gain* by the sale. But the promise must have been intended to mean something, and we incline to the opinion that it should be construed as meaning, that Wilson, who was largely indebted on the building account, should lose nothing, or be required to pay nothing on that account, more than would be derived from the proceeds of the sale; or that he should not be chargable with the excess of the balance due from him, over and above the amount of his share of the proceeds of the sale. And with this understanding of the declaration and promise of Hewitt, we think that he and his firm, for whom he acted, especially as complainants in equity seeking a decree against Wilson, ought not to be allowed to recover the amount of this excess from Wilson. Deducting, therefore, the amount of this excess, which is $1184 58 cents, from the amount of the decree of the Chancellor against him, a balance will be left of only $428 46 cents, which sum alone should have been decreed against him in favor of the complainants.

It is, therefore, the opinion of the Court, that the decree of the Chancellor be reversed, upon the errors assigned by the complainants, as well as the cross errors of Wilson, and that the cause be remanded, that a decree may be rendered quieting Quarrier, Bell, and Bradford in their title to the boat Hugh L. White, and that they be decreed to pay the balance of the amount, if any yet due and unpaid upon their purchase of the same, and that the sum of $5055 95 of the amount, be set apart or paid to the complainants, Hewitt, Ruffner & Co. in satisfaction of that amount due to them from Sturdevant upon the settlement of the partnership accounts in the boat, and that the balance of the one-third of the proceeds of the sale of the boat, Sturdevant's interest in the same, be decreed to Woods, Stacker & Co. and such other and further decree over in their favor against Sturdevant, as may be equitable, not inconsistent with this opinion; and that a decree may be rendered in favor of Hewitt, Ruffner & Co. against Wilson, for $428 46 cents, as the balance due from the latter to the former, on the settlement of the boat account, and that costs be decreed as may be equitable and proper; and the plaintiffs in error are entitled to their costs in this Court, and Wilson is entitled to his costs on his cross errors.

*Duncan* for Hewitt, &c.: *Guthrie* for Wilson, &c.